Filed 9/29/22
See concurring opinion

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E077058 |
| v. | (Super.Ct.No. BAF1600917) |
| NOY ESTUL BOUKES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. John D. Molloy, Jeffrey Prevost, and Michael B. Donner, Judges. Affirmed in part; reversed in part and remanded with directions.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A.1.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant guilty of the first degree murder of victim 1 (Pen. Code, § 187, subd. (a), count 1),[1] threatening victim 2 (§ 422, count 2), and falsely imprisoning victim 2 (§ 236, count 3). The jury also found true allegations that defendant intentionally murdered victim 1 while he was an active member of a criminal street gang (§ 190.2, subd. (a)(22) (special circumstance finding); that he personally discharged a firearm during the commission of the murder, proximately causing great bodily injury or death (former § 12022.53, subd. (d); Stats. 2018, ch. 423, § 114; and § 1192.7, subd. (c)(8)); and that the offenses in counts 2 and 3 were committed for the benefit of, at the direction of, or in association with a criminal street gang (former § 186.22, subd. (b)(1)(A); Stats. 2017, ch. 561, § 178).

In a separate proceeding thereafter, defendant admitted he had suffered three prior prison terms (former § 667.5, subd. (b); Stats. 2018, ch. 423, § 65) and two prior strike convictions (former § 667, subds. (c), (e)(2)(A); Stats. 2018, ch. 1013, § 1; former § 1170.12, subd. (c)(2)(A); Stats. 2018, ch. 423, § 85). (See *People v. Boukes* (Dec. 4, 2020, E072973) [nonpub. opn.] (*Boukes*).) The trial court sentenced defendant to state prison for life without the possibility of parole plus 78 years to life. (*Ibid.*)

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

On appeal from the judgment, we remanded the matter to the trial court for resentencing. (*Boukes*, *supra*, E072973.) The trial court then struck the prior prison term enhancements and imposed, but struck punishment on the gang enhancements attached to counts 2 and 3. Defendant now contends that, pursuant to Assembly Bill No. 333 (2021-2022 Reg. Sess.), the judgments of conviction on counts 1 through 3, and the true findings on all the gang-related allegations, including the special circumstance finding, must be reversed. We reverse the gang enhancements and special circumstance finding; we remand the matter with directions to the trial court. In all other respects, we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

Defendant, a member of the white supremacist COORS Family Skins gang, (COORS), took his friend, victim 1, "who was also a member of the gang or at least a 'hang-around,' to an isolated area of Hemet and shot and killed him over a $550 drug debt owed to the Aryan Brotherhood prison gang."[3] When victim 1's girlfriend,

---

[2] By order dated December 23, 2021, we granted defendant's request that we take judicial notice of our record in *Boukes*, *supra*, E072973, from defendant's appeal of the original judgment. (Evid. Code, §§ 452, subd. (d), 459; Cal. Rules of Court, rule 8.1115(b)(1).)

[3] Victim 1 also had "white supremacist" tattoos, such as "swastikas" and a tattoo of "Adolph Hitler." (*Boukes*, *supra*, E072973.)

victim 2,[4] tried to get out of the car to help victim 1, "defendant threatened her with a gun, told her to get back in the car, and kept her from leaving." (*Boukes*, *supra*. at p. 2.)

Prior to the killing, defendant approached another drug user and said he was there to "tax" him every week on behalf of the Aryan Brotherhood. Defendant demanded $125, but the drug user gave him nothing. In a second incident, defendant went to the drug user's home unannounced and again demanded $125. The drug user told defendant to get out; defendant said he "would regret it." During a third encounter, defendant went uninvited to the drug user's home at 3:00 a.m., walked through his partly open garage door, and once more demanded $125 on behalf of the Aryan Brotherhood. The drug user pulled out a gun and told defendant to "get out of my fucking house." Defendant replied, "You're going to regret this." (*Boukes*, *supra*, E072973.)

Also before the murder, defendant told a paid informant for the police department that victim 1 was not answering his calls about the $550 he owed "to his big homies"— the Aryan Brotherhood—and defendant "was getting really pissed off about it." Defendant said victim 1 had been "put in the hat," meaning he was in trouble with the Aryan Brotherhood. The informant offered to pay the victim's debt and told defendant "he didn't have to do that shit." But defendant did not take the money. (*Boukes*, *supra*, E072973.)

---

[4] Victim 2 denied she was a member of COORS, though her e-mail address and social media accounts had numerous references to COORS and its symbols. (*Boukes*, *supra*, E072973.)

On the evening of July 18, 2016, victims 1 and 2 were at a friend's house. Victim 2 called defendant, around 10:23 p.m., to come get them. Defendant, driven by someone else, came and picked them up in her car. She stopped the car; defendant and victim 1 got out. Victim 2 remained in the back seat, "probably doing drugs." She then heard two gunshots close to the vehicle. Victim 2 heard no struggle or arguing before the gunshots, and she had not seen defendant with a weapon. Victim 2 opened the car door; defendant told her to get back in the vehicle. When victim 2 again tried to get out, defendant pointed a gun at her and said, "shut the fuck up and get back in the car," and then pushed her back inside. (*Boukes*, *supra*, E072973.)

Although it was dark out, victim 2 saw someone in the yard with a flashlight. One of two residents who heard the gunshots approached the car pointing a flashlight; they saw victim 1 lying on the ground a few feet from the trunk of the car. Defendant crouched down, pulled what appeared to be a jacket over his head, then backed around to the passenger side of the car, and got in. Defendant told victim 2 to "shut the fuck up or he's going to kill [her] too." Victim 2 did not see victim 1 get shot or know who had shot him, but she assumed he had been shot because he did not get back into the car. They then drove off. The two residents who had heard the gunshots saw the car back up to the main road. The resident with the flashlight walked over and saw that victim 1 was lifeless. (*Boukes*, *supra*, E072973.)

When they arrived at the home of the driver's friend, defendant used a paper towel to wipe off what appeared to be blood from his clothing. He told the informant, "I did that fool," meaning that he killed victim 1. Defendant told the informant he had tried to

put the body in the back of the car but had to leave it. Defendant said, "he was going to get rid of the two people that seen him kill [victim 1]." Specifically, defendant said he was going to kill or "smoke them" because they were the only two witnesses to the murder. The informant told defendant that they did not deserve to die, and defendant was not "thinking things through" because the uncle of one of them was a respected member of another skinhead gang. (*Boukes*, *supra*, E072973.)

Defendant gave the informant a box with a revolver inside and asked him to get rid of it. The informant told defendant to leave and said he did not want the gun in his house. However, the informant offered to grind the gun down so defendant could get rid of the gun in pieces; defendant left the gun when he departed. The informant immediately tried calling and texting his contact with the police department, but received no answer. (*Boukes*, *supra*, E072973.)

At 5:45 that same morning, defendant returned to the informant's house. The informant spoke to defendant in the garage; defendant said he wanted his gun back. The informant gave defendant the box with the gun and told defendant not to come back to his house. Victim 2 told the informant that defendant had killed victim 1, that she felt guilty about telling defendant where she and victim 1 had been, and that defendant said he was going to kill her too. (*Boukes*, *supra*, E072973.)

Officers who responded to a 911 call about shots fired, discovered victim 1 lying on the pavement in a pool of blood. He had a gunshot wound on the top right side of his head, what appeared to be a large exit wound on the top of his head, and a gunshot wound on his back between the shoulder blades. A bullet was found under his body when he

6

was turned over.  Nothing indicated the body had been moved, and it appeared he had been shot and died where he fell.  (*Boukes*, *supra*, E072973.)

What appeared to be a copper fragment of a bullet jacket was discovered in the middle of the street.  Tire impressions, similar to the tread on tires in the car in which defendant had arrived, were found near the body in patches of dirt on the roadway.  To the right of the body, on the pavement and a curb, investigators found bloody partial shoe impressions that were consistent with the soles of defendant's shoes.  Officers found no shell casings.  (*Boukes*, *supra*, E072973.)

A postmortem examination of the body revealed the bullet that entered victim 1's back passed through his spinal cord and exited just below his Adam's apple.  The bullet, which entered the top right side of his head, passed through his brain and exited the left side of his head.  (*Boukes*, *supra*, E072973.)

Officers took defendant into custody on the day of the murder.  They observed that he was visibly nervous, shaking uncontrollably, and sweating.  Defendant kept asking why the officers had stopped him and why he was being arrested.  He had what appeared to be heroin in his pockets.  (*Boukes*, *supra*, E072973.)

The sole of defendant's right shoe appeared to have blood on it.  The shoes later tested positive for the presence of blood, the DNA of which further tested consistent with victim 1's DNA.  What appeared to be a spot of blood on the right front leg of defendant's shorts tested presumptively positive for blood.  The front passenger seat floorboard of the car reacted positively when sprayed with a chemical reagent used to detect the presence of blood.  (*Boukes*, *supra*, E072973.)

7

Officers interviewed the informant the evening after the murder. He told officers defendant had used a towel to wipe off blood and had thrown the towel in a trash can. The informant also told the officers defendant had two spent, .357 bullet casings with him, which he may have thrown in the trash. Officers searched the informant's house but found no bloody towel or spent shell casings. (*Boukes*, *supra*, E072973.)

After the murder, victim 2 communicated with the informant's wife through social media; victim 2 told her, "I'm so lucky [the informant] stood up for me . . . otherwise I would be dead too." Victim 2 also communicated with the other drug user, telling him, "I'm straight fucked up grieving over [victim 1] getting murdered in front of me," and "I wanted to help [victim 1], but I had a gun in my face telling me to get back in the car." Victim 2 wrote, "[W]hat kind of friend does that to a person you claim to be your comrade?" Victim 2 believed victim 1 had been a loyal friend and comrade to defendant. To another friend, she wrote, "By his own fucking comrade, I don't trust now because of what happened." Victim 2 wrote that she did not set up [victim 1] to be murdered; she defended herself from accusations that she had. (*Boukes*, *supra*, E072973.)

From county jail, defendant spoke to someone by phone with whom he discussed Kern Valley, the location of a state prison, where they had "friends." At the time of the call, a suspected "shot-caller" for COORS was incarcerated in Kern Valley. Defendant said, "I may be getting . . . a rock. You know, like over all that." A "rock" or "shamrock" is a green, three-leaf clover tattoo worn by members of the Aryan Brotherhood. (*Boukes*, *supra*, E072973.)

8

Defendant also spoke with someone else from jail whom he told, "if it wasn't for that other person in the car," i.e., victim 2, "I wouldn't even be here." Defendant also said, "I'm not going to beat this shit, but I'm just hoping I get involuntary manslaughter or something, you know, and get a good deal." In another phone conversation, defendant said if he were bailed out of jail, he would flee. (*Boukes*, *supra*, E072973.)

Defendant appealed the judgment challenging, in part, the sufficiency of the evidence to support the jury's findings on the special circumstance allegation and the gang enhancements. (*Boukes*, *supra*, E072973.) We affirmed the judgment but remanded the matter so that the trial court could impose or strike the gang enhancements on counts 2 and 3. (*Ibid*.) We also directed the court to strike the three, one-year prior prison term enhancements. (*Ibid*.) On remand, pursuant to the parties' stipulation, the court struck the prior prison term enhancements and imposed but struck punishment on the gang enhancements on counts 2 and 3.

After defense counsel filed a notice of appeal, this court appointed counsel to represent him. Counsel filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) and *Anders v. California* (1967) 386 U.S. 738, setting forth a statement of the case and requesting this court review the record for any potentially arguable issues. By opinion filed September 13, 2021, we affirmed.

On November 15, 2021, defendant filed a motion to stay the issuance of the remittitur and reinstate the appeal, contending that since his appeal was not yet final, Assembly Bill No. 333, which amended section 186.22 (Stats. 2021, ch. 699, § 3), should apply retroactively to his case. By order dated December 7, 2021, we vacated our

9

September 13, 2021, opinion, struck defense counsel's *Wende* brief, and set a briefing schedule. On April 18, 2022, after the parties had completed briefing the case, defendant filed a motion to file a supplemental brief, which we granted. Both appellant and respondent filed supplemental briefs.

## II. DISCUSSION

### A. Assembly Bill No. 333

Defendant contends that Assembly Bill No. 333 requires reversal and remand of the special circumstance finding (§ 190.2, subd. (a)(22))[5] attached to his count 1 conviction and the gang enhancements attached to his count 2 and count 3 convictions. He contends the predicate offenses must now be shown to have been committed "collectively," not individually. Defendant further maintains that "the prosecution did not present evidence that the predicate offenses commonly benefitted a criminal street gang in a manner that was more than reputational" and that "the prosecution relied, in part, on the reputational benefit of the shooting in this case to" defendant's gang.

In his supplemental brief, defendant cites *People v. Burgos* (2022) 77 Cal.App.5th 550 (*Burgos*) (dis. opn. of Elia, J.), review granted July 13, 2022, S274100, for the proposition that Assembly Bill No. 333's addition of section 1109 (Stats. 2021, ch. 699, § 5) and the right of a defendant to have gang enhancements tried separately should apply retroactively to his case. Therefore, defendant maintains he was prejudiced by the

---

**5** Assembly Bill No. 333 applies to gang-murder special circumstances. (*People v. Lee* (2022) 81 Cal.App.5th 232, 245 ["[W]e conclude that the term 'criminal street gang" as incorporated in the gang-murder special-circumstance statute was 'intended to conform at all times' and 'remain permanently parallel' to section 186.22."].)

evidence presented to support the special circumstance and gang enhancement findings during his trial on the substantive counts; thus, he maintains, that all the judgments of conviction and enhancements must be reversed.

The People agree that Assembly Bill No. 333 applies retroactively. However, the People contend that "remand is unnecessary to prove the gang special circumstance for murder and the gang enhancements because it is beyond a reasonable doubt that the jury would have imposed them," i.e., any error is harmless beyond a reasonable doubt. The People specifically argue "remand is unnecessary because it was stipulated at trial that [defendant] knew that gang members collectively engaged in a pattern of criminal gang activity such that it is beyond a reasonable doubt that the jury would have imposed the special circumstance and the enhancements."

We agree with defendant that the special circumstance and gang enhancement findings must be reversed. However, we disagree with defendant that the bifurcation requirement in section 1109 applies retroactively to defendant.

A gang expert testified that violence is "the ultimate form of currency" for gang members because it earns them respect within the gang, from members of other gangs, and the wider community. (*Boukes*, *supra*, E072973.) Members also earn respect by committing crimes or "putting in work" for the benefit of the gang. Assaults, thefts, threats, and other "antisocial criminal behavior" done for the gang bolsters its reputation. If a gang member is "put in the hat," it means the member is "up for discipline, and somebody needs to handle that discipline." The gang decides how to discipline its members, which might include "a simple assault or a homicide." (*Ibid.*)

11

At the time of the murder, COORS had approximately 50 members in the Hemet/San Jacinto area. Its members wear red clothing (such as red suspenders), they have white power tattoos (such as swastikas and lighting bolts), and they use the numbers 14 and 88 in their tattoos, on their clothing, and on social media. The number 88 is significant in white power gang culture because the eighth letter of the Latin alphabet is H, and HH is short for "Heil Hitler." In addition, white power gangs subscribe to the writings of David Lane, a white supremacist sentenced to prison for murdering a Jewish disc jockey, who wrote about "88 precepts" the white culture must follow to survive. The number 14 refers to the "14 words of David Lane": "'We must secure the existence of our people and the future of our white children.'" (*Boukes*, *supra*, E072973.)

COORS members associate with, and sometimes cooperate with, members of rival California white power gangs such as, "Public Enemy Number 1," "Public Death Squad," and the "Hemet Valley Skins." COORS also associate with the Aryan Brotherhood prison gang. The primary activities of COORS included "violent assaults, felony weapons possessions, narcotics sales, . . . and auto theft." (*Boukes*, *supra*, E072973.)

In the ranks or hierarchy of skinhead and white supremacist gangs, the Aryan Brotherhood is at the top. Street level members of white supremacist gangs aspire to become members of the Aryan Brotherhood; they can achieve that goal by committing crimes such as selling drugs, collecting debts, and engaging in violent crimes including murder. Members of the Aryan Brotherhood wear "rock" or "shamrock" ("green three leaf clover") tattoos. It is a "bad mistake" for a nonmember to get a "shamrock" tattoo, and such an act could result in "violent consequences." (*Boukes*, *supra*, E072973.)

12

On August 10, 2008, a member of COORS committed attempted murder, first degree burglary, and active participation in a criminal street gang, offenses for which he was convicted on October 8, 2010. On February 11, 2014, another member of COORS drove a vehicle without the owner's consent, for which he was convicted on June 13, 2014. Yet another member of COORS committed criminal threats on or about July 6, 2014, for which he was convicted on March 24, 2015. On April 6, 2016, a fourth member of COORS committed assault with a deadly weapon on a police officer and felony evading arrest, offenses for which he was convicted on December 15, 2016. On August 22, 2016, a fifth member of COORS was convicted of being a felon in possession of a firearm for an offense that occurred on May 5, 2016. And a sixth member of COORS was convicted of possession of a controlled substance for the purpose of sales on November 22, 2016, for an offense committed on July 8, 2016.

The parties stipulated that defendant was an active participant in COORS, and he knew COORS members engaged in a pattern of criminal gang activity. On March 6, 2013, defendant was convicted of first degree burglary for an offense that occurred on February 8, 2013. The People's gang expert opined that defendant was a member of COORS on the date of victim 1's death.

Answering a hypothetical question posed by the prosecutor, the gang expert opined that if a person were "in the hat'" by the Aryan Brotherhood because he owed the gang $500 for drugs, and a member of COORS were to take that individual to an isolated place and shoot him once in the back and once in the back of the head, and later boast that he might "get a rock over this," the crime would further the activities of both

13

COORS and the Aryan Brotherhood. The benefit to COORS would be the same regardless of the amount owed by the victim and even if the member did not act under direct orders from the Aryan Brotherhood. The COORS gang would benefit because "[i]ndividuals will now pay their drug debts on time; individuals now recognize that you do not mess with the COORS criminal street gang," and the killer's "status increases because he is willing to commit a homicide for the organization." (*Boukes*, *supra*, E072973.) It would signify that "when you buy drugs from the COORS gang and you don't pay your debt, there's a significant consequence for that."

The expert also opined that COORS would benefit if the killer in the hypothetical had threatened a witness to the shooting and told her to get back in the car or he would kill her. Gang members are more effective if they can commit crimes and not have witnesses come forward, so threatening a witness benefits the gang "both in reputation as well as generating income." (*Boukes*, *supra*, E072973.) Similarly, the expert opined COORS would benefit if the killer in the hypothetical had forced the witness into the car against her will and taken her to another location when she had asked to be let out. The gang would benefit because the witness would be frightened and less willing to testify, and anyone else in the vehicle would get the message that they had better not come forward. (*Ibid.*)

### 1. The special circumstance and gang enhancement findings

"Assembly Bill 333's substantive changes apply retroactively to all cases—like [defendant]'s—in which the judgment of conviction is not yet final because the changes 'redefine, to the benefit of defendants, conduct subject to criminal sanctions.'" (*People v.*

14

*E.H.* (2022) 75 Cal.App.5th 467, 478 (*E.H.*); accord *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128 (*Ramos*).)  "Assembly Bill 333 [now] requires the prosecution to prove the benefit the gang derives from the predicate and current offenses is 'more than reputational.'"  (*E.H.*, at p. 478.)  "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant.'"  (*Ibid.*)

"Because Assembly Bill 333 essentially adds new elements to the substantive offense and enhancements in section 186.22 . . . the prejudice standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 . . . applies.  [Citation.]  Under that standard, the absence of instruction on the amended version of section 186.22 requires reversal unless 'it appears beyond a reasonable doubt that the error did not contribute to th[e] jury's verdict.'"  (*E.H.*, *supra*, 75 Cal.App.5th at p. 479; accord *People v. Sek* (2022) 74 Cal.App.5th 657, 669 ["Although there was a great deal of evidence of benefits to the gang that went beyond reputational, we cannot rule out the possibility that the jury relied on reputational benefit to the gang as its basis for finding the enhancements true. Thus, the instructional error on this question was not harmless under the *Chapman* standard."].)

Here, the People did not adduce any evidence of a benefit COORS may have derived from the predicate offenses, let alone that it was more than just reputational. Defendant's stipulation that he was a member of COORS and knew that COORS engaged in criminal activity does not fix this; defendant did not stipulate that the six (or

seven if you include defendant's prior criminal act and conviction) specifically benefitted COORS in any way. Thus, the special circumstance and gang enhancement findings must be reversed, and the matter remanded to give the People the opportunity to retry it. (*E.H.*, *supra*, 75 Cal.App.5th at p. 480 ["The proper remedy for this type of failure of proof—where newly required elements were 'never tried' to the jury—is to remand and give the People an opportunity to retry the affected charges."].)

Defendant additionally maintains that the predicate acts had to have been committed "collectively," i.e., by more than one member of COORS. We disagree.

"Assembly Bill No. 333 also redefines 'pattern of criminal gang activity' to require . . . that the predicate offenses were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit of the offenses is more than reputational." (*People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032.) In *People v. Delgado* (2022) 74 Cal.App.5th 1067 (*Delgado*), the court rejected "the People's contention that proof that *individual* gang members committed the predicate offenses on separate occasions is sufficient to show the gang members 'collectively' engaged in a pattern of criminal activity." (*Id*. at p. 1073, italics added.)

Instead, the *Delgado* court "read the term 'collectively' in a commonsense manner to mean what it says—committed by more than one person, and not, as argued by the People, individually but on a different day." (*Delgado*, *supra*, 74 Cal.App.5th at pp. 1088-1089.) The *Delgado* court agreed with the defendant that "amended [section 186.22,] subdivision (f)'s requirement that gang members 'collectively engage' in a

16

pattern of criminal gang activity means the People were required to prove that two or more gang members committed each predicate offense in concert . . . ." (*Id*. at p. 1088.) Thus, the court reversed the gang enhancement because the People presented no evidence that multiple gang members committed the predicate offenses and "because the trial court erred in instructing the jury under former [section 186.22,] subdivision (f) that it could find the gang enhancements true if the People proved that members of the . . . gang, '*whether acting alone* or together, engage in or have engaged in a pattern of criminal gang activity.'" (*Ibid*., italics added.)

Similarly, the court in *People v. Lopez* (2021) 73 Cal.App.5th 327 (*Lopez*), noted that when Assembly Bill No. 333 became effective, it would "require the prosecution to prove collective, not merely individual, engagement in a pattern of criminal gang activity." (*Lopez*, at p. 345.) "[P]ursuant to the new legislation, imposition of a gang enhancement requires proof [that] the predicate offenses must be committed on separate occasions or *by two or more gang members* . . . ." (*Ibid*., italics added.)

More recently, a panel of this court in *People v. Clark* (2022) 81 Cal.App.5th 133 (*Clark*), disagreed with both *Delgado* and *Lopez*. (*Clark*, at pp. 144-145.) *Clark* did not find "the *Delgado* analysis to be persuasive because it turned to legislative history after merely defining the word 'collectively.' [Citation.] It did not . . . devote sufficient attention to the plain language of the statute." (*Id*. at p. 145.)

17

The *Clark* court reasoned that "[i]f 'collectively' means the prior crimes must have been committed in concert, then the first alternative in section 186.22, subdivision (e)(1) is rendered surplusage. The two alternatives are proving that '[(1)] the offenses were committed on separate occasions or [(2)] by two or more members. (§ 186.22, subd. (e)(1).) If 'collectively' means the predicate crimes had to be committed in concert, then the prosecutor must always prove the predicate crimes were committed 'by two or more members." The alternative option that 'the offenses were committed on separate occasions' would be surplusage. (§ 186.22, subd. (e)(1).) We avoid interpreting the statute in a manner that would render one of the explicit options surplusage." (*Clark*, at p. 145.)

*Clark* did "not find *Lopez* to be persuasive authority because it did not provide a plain language analysis of the statute pertaining to the phrases (A) 'members collectively' (§ 186.22, subd. (f)); and (B) 'the offenses were committed on separate occasions or by two or more members' (§ 186.22, subd. (e)(1))." (*Clark*, *supra*, 81 Cal.App.5th at p. 145.) Thus, *Clark* concluded that "a pattern of criminal gang activity may be established by (1) two gang members who separately committed crimes on different occasions, or (2) two gang members who committed a crime together on a single occasion." (*Id*. at pp. 145-146.)

We agree with our colleagues in *Clark*. Thus, here, the People adduced sufficient evidence below that the predicate offenses "'were committed on separate occasions.'" (*Clark*, *supra*, 81 Cal.App.5th at p. 145.)

## 2. *Section 1109 and bifurcation*

Defendant contends the jury's convictions on the substantive offenses and the true finding on the personal use enhancement were prejudiced by the evidence presented on the special circumstance and gang enhancement findings. Defendant argues the presentation of such evidence is now required to be bifurcated via Assembly Bill No. 333's addition of section 1109, which he asserts applies retroactively to his case. Thus, defendant maintains that all his judgments of conviction and the true finding on the personal use enhancement must be reversed. We disagree.

In *Burgos*, *supra*, 77 Cal.App.5th 550, the majority held that section 1109 operated retroactively, such that a trial in any case in which a former section 186.22 enhancement was not bifurcated from the trial on the remaining offenses and enhancements, was inherently prejudicial. (*Id*. at pp. 554, 561.) The court held that whether the judgments should ultimately be reversed should be evaluated under an unspecified harmless test, strongly insinuating that the "error" was structural and required per se reversal. (*Id*. at pp. 554, 561, 568 ["Even assuming we must assess prejudice, however, we conclude appellants suffered prejudice under either the federal or state law standard."]; accord *Ramos*, *supra*, 77 Cal.App.5th at p. 1130 ["[W]e conclude section 1109 must apply retroactively to all cases not yet final on appeal."]; but see *Burgos*, at p. 569 (dis. opn. of Elia, J.) [contending that § 1109 is not retroactive]; *People v. Perez* (2022) 78 Cal.App.5th 192 (*Perez*) [same]; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 (*Ramirez*) [same].)

The *Burgos* court reasoned that the bifurcation requirement of section 1109 applied retroactively for several reasons. "First, the plain language of Penal Code section 1109 makes it applicable to a distinct class of defendants—those charged with gang enhancements under subdivision (b) or (d) of Penal Code section 186.22." (*Burgos*, *supra*, 77 Cal.App.5th at p. 565.) Second, "the legislative findings in Assembly Bill 333 also show the Legislature intended to reduce punishment specifically for people of color—who overwhelmingly comprise the class of defendants charged with gang enhancements. The legislative findings show this was a central motivation for the bill: 'The gang enhancement statute is applied inconsistently against people of color, creating a racial disparity.'" (*Id.* at pp. 565-566 ["These statements make clear that one of the Legislature's foremost reasons for enacting Assembly Bill 333 was to ameliorate the disparate levels of punishment suffered by people of color."].) Third, "the Legislature was aware . . . that a statute possibly reducing punishment for a class of persons would apply retroactively." (*Id*. at p. 567 ["The increased likelihood of acquittal at trial is not the only ameliorative effect of bifurcation."].)

The court in *Ramos* agreed, noting that "by its plain language, Assembly Bill 333 is an ameliorative change to the criminal law intended to benefit a class of criminal defendants by reducing the potential harmful and prejudicial impact of gang evidence through bifurcation. The legislation is geared to address wrongful convictions and mitigate punishment resulting from the admission of irrelevant gang evidence at trial." (*Ramos*, *supra*, 77 Cal.App.5th at p. 1129.) However, the *Ramos* court held that in applying the *People v. Watson* (1956) 46 Cal.2d 818 standard of harmless error, the

20

defendant "was not prejudiced by the failure to bifurcate the gang enhancement allegation." (*Ramos*, at p. 1132.)

Justice Elia, dissenting in *Burgos*, would have held that the bifurcation provisions of section 1109 were not retroactive to defendants tried prior to its enactment because section 1109 is not an ameliorative statute. (*Burgos*, *supra*, 77 Cal.App.5th at p. 569 (dis. opn. of Elia, J.).) Justice Elia argued that section 1109 made "no change to any crime or defense and makes no change to any punishment provision, and it does not create the possibility of lesser punishment or any other 'ameliorative' benefit" such that it should be applied retroactively. (*Id*. at p. 572.) In *Ramirez*, Justice Elia, writing for the majority, adopted the reasoning in his dissenting opinion in *Burgos*. (*Ramirez*, *supra*, 79 Cal.App.5th at p. 65.)

The *Perez* court agreed, noting that "[a]lthough section 1109 is designed to minimize the prejudicial impact of gang evidence, it does not reduce the punishment or narrow the scope of the application of the gang statute." (*Perez*, *supra*, 78 Cal.App.5th at p. 207.) "[S]ection 1109 is a procedural statute that ensures a jury will not be prejudiced by the introduction of evidence to support gang enhancement allegations—it does not reduce the punishment imposed." (*Ibid*.)

We agree with the courts in *Perez* and *Ramirez*, and Justice Elia's dissent in *Burgos*, that section 1109 does not reduce punishment imposed on gang enhancements and, therefore, does not apply retroactively. Even if we were to hold that it does apply retroactively, we would find in this case that any error in the lack of bifurcation was harmless beyond a reasonable doubt. (*E.H.*, *supra*, 75 Cal.App.5th at p. 480 ["Even if

21

section 1109 applied retroactively to his case . . . [defendant] cannot show it is 'reasonably probable' he would have obtained a more favorable result if his trial had been bifurcated. [Citation.] This is because when the evidence of guilt on the relevant charges is 'overwhelming,' as it was here, it is unlikely the defendant was harmed by the format of the trial."]; accord *Ramos*, *supra*, 77 Cal.App.5th at p. 1131 ["Nevertheless, we affirm [defendant's] conviction . . . because we cannot conclude he was prejudiced by the failure to bifurcate the gang enhancement from the trial on the underlying charges. That is, we cannot conclude it is reasonably probable [defendant] would have obtained a more favorable verdict in the absence of the gang evidence that would not have been presented had the gang enhancement been bifurcated."].)

Here, evidence of defendant's affiliation with COORS and the nature of COORS would have been admissible for reasons aside from any effort to prove the special circumstance and gang enhancement findings, for instance, defendant's motivation for the killing, Second, the prosecution presented overwhelming evidence of defendant's commission of the counts 1 through 3 offenses and the personal use enhancement. That evidence included, but was not limited to, the witness testimonies of victim 2, the two residents of the home at which defendant committed the murder; and the informant; video evidence; physical evidence; and postarrest inculpatory statements made by defendant. Thus, any error was harmless beyond a reasonable doubt.

## III.  DISPOSITION

We reverse the judgment as to the special circumstance and gang enhancement findings.  The matter is remanded for the trial court to provide the People an opportunity to retry the special circumstance and gang enhancement findings under the law as amended by Assembly Bill No. 333; if the People elect not to retry the special circumstance and gang enhancement findings, the trial court is directed to impose a new sentence without the special circumstance and gang enhancement findings.  In all other respects, the judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

McKINSTER_____
J.

I concur:


RAMIREZ_____
P. J.

23

[*People v. Boukes*, E077058]

Slough, J., Concurring.

I agree with the majority's disposition of the case because, given the strength of the evidence against Boukes, it's not reasonably probable bifurcating the trial would have produced a more favorable result for him. (*People v. Tran* (Aug. 29, 2022, S165998) __ Cal.5th __ [2022 Cal. LEXIS 5119].) I write separately because I conclude Penal Code section 1109 is ameliorative and therefore applies to cases that are not yet final. (*In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).)

I believe section 1109 provides defendants charged with gang enhancements an ameliorative benefit, specifically, a bifurcated trial which is designed to and has the effect of increasing the likelihood of acquittals and reducing punishment for an identified class of persons. In my view, under recent California Supreme Court precedent developing the *Estrada* rule, that means the Legislature intended the new provision to apply retroactively to the cases of defendants, like Boukes, whose cases are not yet final. (*People v. Frahs* (2020) 9 Cal.5th 618, 627-628 *(Frahs)*.)

In *Frahs*, the Supreme Court explained " '[t]he *Estrada* rule rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' " (*Frahs*, *supra*, 9 Cal.5th at p. 628.) The question we face is whether the new bifurcation rule is ameliorative. The majority concludes it is not because the rule is procedural in nature and doesn't directly reduce punishment. (Maj. opn. *ante*, at p. 21.) While that characterization

1

is undoubtedly true, it doesn't end the matter. I think their approach is inconsistent with how the *Estrada* rule has developed.

In *Frahs*, the Supreme Court considered the retroactive application of new provisions which gave trial courts the discretion to grant pretrial diversion for defendants with mental health disorders. (*Frahs*, *supra*, 9 Cal.5th at pp. 624, 626.) That change too was "procedural" and didn't directly reduce punishment. But the Supreme Court dug deeper. In considering whether the new law was ameliorative under *Estrada,* they emphasized "by design and function [the change] *provides a possible ameliorating benefit for a class of persons*—namely, certain defendants with mental disorders—by offering an opportunity for diversion and ultimately the dismissal of charges." (*Frahs*, at p. 624, italics added.) They also emphasized the new procedures "carry the *potential of substantial reductions in punishment.*" (*Id.* at p. 631, italics added.) On those grounds, they concluded the legislative changes were ameliorative and applied retroactively to nonfinal cases. (*Id. at* pp. 631-632.)

The Supreme Court reached a similar conclusion in *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308. There, the Court considered the retroactivity of Proposition 57, which changed the law to prohibit prosecutors from filing charges directly against a minor in an adult criminal case and to give juvenile courts discretion to determine whether a minor can be prosecuted and sentenced as an adult. (*Lara*, at p. 308.) In *Lara*, the Court acknowledged Proposition 57 did not mitigate punishment for any particular crime but held the *Estrada* rule applies because the new law "reduces the possible punishment" for juveniles. (*Lara*, at p. 303.) The Court emphasized "[t]he

possibility of being treated as a juvenile in juvenile court—where rehabilitation is the goal—rather than being tried and sentenced as an adult can result in dramatically different and more lenient treatment." (*Ibid.*) The effect of the change was to increase the possibility of a lesser sentence for a class of defendants, making the new provision ameliorative and the *Estrada* rule apply.

The majority simply ignore these developments in the law. For them, the fact that "[Penal Code] section 1109 does not reduce punishment imposed on gang enhancements" means the new law "does not apply retroactively." (Maj. opn. *ante*, at p. 21.) I believe *Lara* and *Frahs* have already called this kind of analysis into doubt. And I can't see the difference between the facts of those cases and this one. Instead, I agree with the Court of Appeal in *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129, that "by its plain language, Assembly Bill 333 is an ameliorative change to the criminal law intended to benefit a class of criminal defendants by reducing the potential harmful and prejudicial impact of gang evidence through bifurcation." Since "[t]he legislation is geared to address wrongful convictions and mitigate punishment resulting from the admission of irrelevant gang evidence at trial . . . the logic of *Estrada* applies." (*Ibid.*)

I also find persuasive the majority opinion in *People v. Burgos*, which concluded Penal Code section 1109 is an ameliorative statute because bifurcation increases the possibility of acquittal, "which necessarily reduces possible punishment." (*People v. Burgos* (2022) 77 Cal.App.5th 550, 567 (*Burgos*).) In a careful and thorough opinion, the *Burgos* majority marshaled evidence from the legislative findings for the law which showed the Legislature's purpose in including Penal Code section 1109 (Stats. 2021,

3

ch. 699, § 5) in Assembly Bill No. 333 (2021-2022 Reg. Sess.) was specifically to reduce punishment. " 'Bifurcation of trials where gang evidence is alleged can help reduce its harmful and prejudicial impact.' " (*Burgos*, at p. 566, quoting Assem. Bill No. 333, § 2, subd. (f).) The findings also noted bifurcation is intended to mitigate the possibility of wrongful convictions and pressure on defendants to accept unfavorable plea deals " 'rather than risk a trial filled with prejudicial evidence and a substantially longer sentence.' " (*Burgos*, at p. 567.)

I agree with the majority in *Burgos* that, as in *Frahs*, Penal Code section 1109 "provides a possible ameliorating benefit for a class of persons." (*Frahs*, *supra*, 9 Cal.5th at p. 624.) Here, the new law gives defendants the right to request a bifurcated trial free of otherwise irrelevant and prejudicial gang enhancement evidence. (*Ibid*.; see also *Burgos*, *supra*, 77 Cal.App.5th at p. 567.) At bottom, section 1109 is ameliorative because it carries "the potential of substantial reductions in punishment for the [defendants]" and provides the benefit of bifurcated trials free from prejudicial gang enhancement evidence. (*Frahs*, at p. 631; *Lara*, *supra*, 4 Cal.5th at pp. 308-309.)

Although I believe Penal Code section 1109 applies retroactively, I would not require retrial of the underlying murder, threat, and false imprisonment convictions or the firearm enhancement because the failure to bifurcate was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Tran*, *supra*, __ Cal.5th at p.__ [2022 Cal. LEXIS 5119, at p. *58; *People v. E.H.* (2022) 75 Cal.App.5th 467, 480.) First, the evidence of Boukes' guilt on the underlying charges is overwhelming. As the majority note, the evidence against Boukes included the testimony of the person he threatened and

4

imprisoned after he shot her boyfriend and she tried to go to him. (Maj. opn. *ante*, at p. 22.) In such circumstances, "it is unlikely the defendant was harmed by the format of the trial." (*People v. E.H.*, at p. 480.) In addition, section 1109 doesn't preclude gang-related evidence in a bifurcated trial if the evidence relates to the underlying charges. (*Ramos*, *supra*, 77 Cal.App.5th at p. 1132.) Boukes' affiliation with the gang in this case was relevant to his motive for carrying out the killing. (*Ibid*.)

As a result, I concur with the majority's disposition.

SLOUGH
J.

5